IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WALGREEN CO. (an Illinois corporation), | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 08-cv-5694 |
| WYETH (a Delaware corporation), | ) ) ) | Judge G. W. Lindberg Magistrate Judge A. Keys |
| Defendant. | ) ) | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF SUMMARY JUDGMENT

Attorneys for Plaintiff Walgreen Co.

LEYDIG, VOIT & MAYER, LTD.
Mark J. Liss (IL Bar No. 6181002)
Tamara A. Miller (IL Bar No. 6237169)
Caroline L. Stevens (IL Bar No. 6274252)
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601
Tel: (312) 616-5600
Fax: (312) 616-5700

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INDEX OF EXHIBITS ................................................................................................. v

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................ 1

II.     SUMMARY OF BACKGROUND FACTS ...................................................... 1

III.    AUTHORITY AND ARGUMENT ................................................................... 3

        A.      The Standards to be Applied to this Motion ........................................ 3

                1.      Summary Judgment Standard ..................................................... 3

                2.      The District Court's Standard of Review for an Appeal of a TTAB Decision. 3

        B.      The Operative Question of Likelihood of Confusion ........................... 4

                1.      The Opinions by the TTAB Majority and by the Dissenting Judge ................ 5

                2.      Application of Likelihood of Confusion Factors and Discussion of New
                        Evidence ..................................................................................... 6

                        (a)     No Evidence of Actual Confusion ................................... 6
                                (i)     Evidence of Lack of Confusion Offered During the Opposition....... 6
                                (ii)    New Evidence of Lack of Actual Confusion ..................................... 8
                                        ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.................................................................. 9
                        (b)     Dissimilarity of the Parties' Marks.......................................... 10
                        (c)     Walgreens' Intent in Adopting "WAL-VERT" ....................................... 14
                        (d)     Consumer Care and Sophistication.......................................... 15
                                (i)     The Degree of Consumer Care in Purchasing Allergy Medicine .... 15
                                (ii)    Consumer Sophistication/Awareness of Private Label Goods ........ 17

                3.      *De Minimis* Potential for Confusion ........................................... 18

IV.     CONCLUSION................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**

*Allen Bros., Inc . v. AB Foods LLC,*
  2008 WL 345600 (N.D. Ill. Feb. 6, 2008) .......................................................................... 8, 14

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................................................ 3

*Anheuser-Busch, Inc. v. Mambo Seafood #1, Inc.,*
  2008 WL 4674603 (T.T.A.B. Sept. 22, 2008) .................................................................... 10

*Barbecue Marx, Inc. v. 551 Ogden, Inc.,*
  235 F.3d 1041, 1044 (7th Cir. 2000) ............................................................................ passim

*Blue Air, Inc. v. Soleus Mobility, Inc.,*
  2004 WL 1459295 (N.D. Ill. June 25, 2004) ..................................................................... 16

*Boston Red Sox Baseball Club L.P. v. Sherman,*
  2008 WL 4149008 (T.T.A.B. Sept. 9, 2008) ....................................................................... 5

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,*
  174 F.3d 1036 (9th Cir. 1999) ............................................................................................ 7

*CAE, Inc. v. Clean Air Eng'g, Inc.,*
  267 F.3d 660 (7th Cir. 2001) ....................................................................................... passim

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................................................ 3

*Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.,*
  2006 WL 4013750 (N.D. Ill. Oct. 6, 2006) ........................................................................ 20

*Conopco, Inc. v. May Dep't Stores Co.,*
  46 F.3d 1556 (Fed. Cir. 1994) ........................................................................................... 18

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ............................................................................................................ 4

*Dickinson v. Zurko,*
  527 U.S. 150 (1999) ............................................................................................................ 4

*Door Sys., Inc. v. Pro-Line Door Sys., Inc.,*
  83 F.3d 169 (7th Cir. 1996) ............................................................................................... 18

*E.I. DuPont DeNemours & Co.,*
  476 F.2d 1357 (C.C.P.A. 1973) ................................................................................ 4, 18, 19

*Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.,*
  954 F.2d 713 (Fed. Cir. 1992) ................................................................................... 5, 18, 20

*Emery v. Nat'l Life & Accident Ins. Co.,*
  614 F. Supp. 167 (S.D. Ill. 1985) ....................................................................................... 3

*Fleming v. U.S.P.S. AMF,*
    1991 WL 278310, (N.D. Ill. Dec. 18, 1991) ............................................................... 3

*H.D. Lee Co. v. Maidenform, Inc.,*
    2008 WL 1976596 (T.T.A.B. May 6, 2008) ........................................................... 18

*Henri's Food Prods. Co. v. Kraft, Inc.,*
    717 F.2d 352 (7th Cir. 1983) ............................................................................... 12

*Jacobs v. Int'l Multifoods Corp.,*
    668 F.2d 1234, 1236 (C.C.P.A. 1982) ................................................................. 11

*Klein-Becker USA, LLC v. Prod. Quest Mfg., Inc.,*
    429 F. Supp. 2d 1248 (D. Utah 2005) ........................................................... 12, 19

*Lever Bros. Co. v. Producers Chem. Serv.,*
    283 F.2d 879 (C.C.P.A. 1960) ............................................................................. 12

*Libman Co. v. Vining Indus., Inc.,*
    69 F.3d 1360 (7th Cir. 1995) ............................................................................ 5, 8

*Lincoln Fin. Advisors Corp. v. SagePoint Fin. Inc.,*
    2009 WL 928993 (N.D. Ind. April 2, 2009) ........................................................ 14

*Magnaflux Corp. v. Sonoflux Corp.,*
    231 F.2d 669 (C.C.P.A. 1956) ............................................................................. 15

*Master Builders, Inc. v. Polymerica, Inc.,*
    2004 WL 407353 (T.T.A.B Feb. 24, 2004) ...................................................... 8, 20

*McGinn v. Burlington Northern R.R. Co.,*
    102 F.3d 295 (7th Cir. 1996) ................................................................. 10, 14, 19

*McGregor-Doniger Inc. v. Drizzle Inc.,*
    599 F.2d 1126 (2d Cir. 1979) .............................................................................. 10

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,*
    128 F.3d 1111 (7th Cir. 1997) ............................................................................. 14

*Nike, Inc. v. "Just Did It" Enters.,*
    6 F.3d 1225 (7th Cir. 1993) ................................................................................. 10

*No Fear, Inc. v. Day,*
    1999 WL 769949 (T.T.A.B. Aug. 31, 1999) ......................................................... 20

*Nunez v. Superior Oil Co.,*
    572 F.2d 1119 (5th Cir. 1978) ............................................................................... 3

*Oest v. Ill. Dep't of Corrections,*
    240 F.3d 605 (7th Cir. 2001) ............................................................................... 10

*Olay Co. v. Avon Prods., Inc.,*
    1973 WL 19958, 178 U.S.P.Q. 502 (T.T.A.B. May 9, 1973) ................................. 12

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,*
    396 F.3d 1369 (Fed. Cir. 2005) .......................................................................... 12

iii

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*,
  657 F.2d 482 (1st Cir. 1981) ........................................................................................ 7

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*,
  80 F. Supp. 2d 815 (N.D. Ill. 1999) ............................................................................ 9

*Posadas de Puerto Rico, Inc. v. Radin*,
  856 F.2d 399 (1st Cir. 1988) ........................................................................................ 3

*Precision Foods, Inc. v. Major Prods. Co.*
  2001 WL 1131865 (T.T.A.B. Sept. 20, 2001), *aff'd*, 49 Fed. Appx. 308 (Fed. Cir. 2002) 16, 17

*RE/MAX Int'l Inc. v. Singh*,
  2008 WL 5256414 (T.T.A.B. Dec. 10, 2008) .......................................................... 12

*Rock-A-Bye Baby, Inc. v. DEX Prods., Inc.*,
  867 F. Supp. 703 (N.D. Ill. 1994) .............................................................................. 18

*Rust Env't & Infrastructure, Inc. v. Teunissen*,
  131 F.3d 1210 (7th Cir. 1997) ........................................................................ 4, 15, 18

*S. Indus., Inc. v. JL Audio Inc.*,
  29 F. Supp. 2d 878 (N.D. Ill. 1998) .......................................................................... 15

*Smithkline Beckman Corp. v. Proctor & Gamble Co.*,
  591 F. Supp. 1229 (N.D.N.Y. 1984), *aff'd*, 755 F.2d 914 (2d Cir. 1985) ............... 16

*Sparknet Commc'ns v. Bonneville Int'l Corp.*,
  386 F. Supp. 2d 965 (N.D. Ill. 2005) ............................................................... 4, 5, 18

*Top Tobacco, L.P. v. North Atlantic Operating Co.*,
  2007 WL 118527 (N.D. Ill. Jan. 4, 2007), *aff'd*, 509 F.3d 380 (7th Cir. 2007) ....... 7

*Toro Co. v. Grassmasters, Inc.*,
  2003 WL 255724 (T.T.A.B. Feb. 4, 2003) .................................................................. 8

*Union Carbide Corp. v. Ever-Ready Inc.*,
  531 F.2d 366 (7th Cir. 1976) ..................................................................................... 10

*Ziebart Int'l Corp. v. After Market Assocs., Inc.*,
  802 F.2d 220 (7th Cir. 1986) ..................................................................................... 19

**Statutes**

15 U.S.C. § 1071(b)(1) ..................................................................................................... 2

5 U.S.C. § 706(2)(E) ......................................................................................................... 6

**Rules**

Fed. R. Civ. P. 52(a) ........................................................................................................ 10

Fed. R. Civ. P. 56 ............................................................................................................... 3

Fed. R. Civ. P. 56(e)(1) ..................................................................................................... 1

Local Rule 56.1(A)(3) ....................................................................................................... 1

iv

**INDEX OF EXHIBITS**

Exhibit 1    Majority Opinion of the Trademark Trial and Appeal Board, Opposition No. 91165912

Exhibit 2    Dissenting Opinion of the Trademark Trial and Appeal Board, Opposition No. 91165912

Exhibit 3    *Fleming v. U.S.P.S. AMF*, 1991 WL 278310 (N.D. Ill. Dec. 18, 1991)

Exhibit 4    *Boston Red Sox Baseball Club L.P. v. Sherman*, 2008 WL 4149008 (T.T.A.B. Sept. 9, 2008)

Exhibit 5    *Top Tobacco, L.P. v. North Atlantic Operating Co.*, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007)

Exhibit 6    *Toro Co. v. Grassmasters, Inc.*, 2003 WL 255724 (T.T.A.B. Feb. 4, 2003)

Exhibit 7    *Allen Bros., Inc. v. AB Foods LLC*, 2008 WL 345600 (N.D. Ill. Feb. 6, 2008)

Exhibit 8    *Master Builders, Inc. v. Polymerica, Inc.*, 2004 WL 407353 (T.T.A.B. Feb. 24, 2004)

Exhibit 9    Report of a Survey to Determine the Likelihood of Confusion, If Any, Between WAL-VERT Antihistamine/Allergy Relief Preparations and ALAVERT ("Simonson Report")

Exhibit 10   *Anheuser-Busch, Inc. v. Mambo Seafood #1, Inc.*, 2008 WL 4674603 (T.T.A.B. Sept. 22, 2008)

Exhibit 11   *Olay Co. v. Avon Prods., Inc.*, 1973 WL 19958 (T.T.A.B. May 9, 1973)

Exhibit 12   *RE/MAX Int'l Inc. v. Singh*, 2008 WL 5256414 (T.T.A.B. Dec. 10, 2008)

Exhibit 13   Expert Report of Ronald R. Butters, Ph.D. ("Butters Report")

Exhibit 14   *Lincoln Fin. Advisors Corp. v. SagePoint Fin. Inc.*, 2009 WL 928993 (N.D. Ind. Apr. 2, 2009)

Exhibit 15   *Blue Air, Inc. v. Soleus Mobility, Inc.*, 2004 WL 1459295 (N.D. Ill. June 25, 2004)

Exhibit 16   *Precision Foods, Inc. v. Major Prods. Co.*, 2001 WL 1131865 (T.T.A.B. Sept. 20, 2001)

Exhibit 17   *H.D. Lee Co. v. Maidenform, Inc.*, 2008 WL 1976596 (T.T.A.B. May 6, 2008)

Exhibit 18    *No Fear, Inc. v. Day*, 1999 WL 769949 (T.T.A.B. Aug. 31, 1999)

Exhibit 19    *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750 (N.D. Ill. Oct. 6, 2006)

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

This is a straightforward, non-jury case for which summary judgment is ripe and appropriate.  There is no genuine issue of material fact that would require a trial.  The evidence presented to the TTAB and new evidence now presented to this Court clearly show there is no likelihood of confusion between ALAVERT and WAL-VERT, and no trier of fact could reasonably conclude otherwise.

## II.  SUMMARY OF BACKGROUND FACTS[1]

On December 20, 2002 Wyeth began selling over-the-counter ("OTC") non-sedating allergy medicines under the mark ALAVERT.  (Facts ¶ 15).  Wyeth owns a registration for ALAVERT, U.S. Reg. No. 2,835,071, covering allergy relief and antihistamine products.  (Facts ¶ 16).  Wyeth sells its ALAVERT medicines to retailers, which sell the medicines to end consumers.  (Facts ¶ 19).

With over 6800 stores in 49 states and Puerto Rico, (Facts ¶ 27), Walgreens is the largest retail pharmacy chain in the United States.  (Facts ¶ 26).  Like many retail chains, Walgreens has long offered private labeled goods (also known as "store brands") as lower-priced alternatives to the more expensive national brands.  (Facts ¶ 31).  Walgreens customarily shelves its OTC private label medicines next to their national brand equivalents, so that consumers can meaningfully compare the products and prices at the point of purchase.  (Facts ¶ 37).

Over thirty years ago, Walgreens began using trademarks comprised of the prefix "WAL", followed by a hyphen, "-" (the "WAL- prefix"), and a suffix, for its private label OTC medicines.  (Facts ¶ 32).  When creating WAL- prefix marks, Walgreens selects a suffix that communicates either (1) the active ingredient of the medicine (if the active ingredient is familiar to consumers); or (2) elements of the name of the national brand equivalent with the same active ingredient(s).  (Facts ¶ 35).  For example, in 1978 Walgreens introduced WAL-PHED and WAL-

---

[1] A detailed Statement of Facts as to which there is no genuine issue is submitted separately pursuant to Local Rule 56.1(A)(3), together with a Declaration under Fed. R. Civ. P. 56(e)(1), and other evidence from the record.  The separately submitted statement of facts and accompanying evidence is referenced herein as "Facts ¶__".

TUSSIN as alternatives to SUDAFED and ROBITUSSIN. (Facts ¶ 33). Since 1978, Walgreens has introduced numerous other OTC medicines under WAL- prefix marks[2] (Facts ¶ 33), and has

Walgreens has sold ALAVERT since 2002. (Facts ¶ 30).

Walgreens did not believe consumers were familiar with the active ingredient in ALAVERT, namely, loratadine. (Facts ¶ 36). Therefore, like it had done numerous times during the previous 26 years, (Facts ¶ 36), Walgreens chose a suffix, "VERT", that it believed would help communicate that the product being offered was equivalent to the national brand. (Facts ¶ 36).

On May 25, 2004, Walgreens applied to register WAL-VERT for "antihistamines and allergy relief preparations" on an intent-to-use basis. (Facts ¶¶ 6, 7). In September 2004, Walgreens began selling WAL-VERT. (Facts ¶ 7). The USPTO approved the application for WAL-VERT, and on May 10, 2005, the application was published for opposition. (Facts ¶ 9). On July 18, 2005, Wyeth filed an Opposition with the TTAB, requesting that the WAL-VERT application be refused on the grounds it was likely to cause confusion with and dilute ALAVERT, which Wyeth claimed was famous.[3] (Facts ¶¶ 10, 11). The panel of TTAB Judges issued a 2-1 decision sustaining Wyeth's Opposition, with one of the Judges dissenting. (Facts ¶ 13; Ex. 1, TTAB Majority Opinion ("Maj. Op.") and Ex. 2, TTAB Dissenting Opinion ("Dis. Op.")). Walgreens appealed the TTAB decision to this Court pursuant to Section 21(b)(1) of the Lanham Act, 15 U.S.C. § 1071(b)(1).

---

[2] Walgreens is currently using many WAL- prefix marks for OTC medicines, most of which are registered marks, namely: WAL-PHED® (Sudafed) since 1978; WAL-TUSSIN® (Robitussin) since 1978; WAL-DRYL® (Benadryl) since 1988; WAL-TAP® (Dimetapp) since 1993; WAL-HIST® (Tavist Allergy) since 1994; WAL-FLU® (Theraflu) since 1994; WAL-SOM® (Unisom) since 2002; WAL-ZAN® (Zantac) since 2002; WAL-FORMULA™ (Vicks Formula 44) since 2002; WAL-FOUR® (4-Way Nasal Spray) since 2002; WAL-ACT™ (Actifed) since 2002; WAL-ITIN® (Claritin) since 2003; WAL-BORN® (Airborne) since 2005; WAL-MUCIL® (Metamucil) since 2005; WAL-FIBER™ (Fiber Sure) since 2006; and WAL-ZYR™ (Zyrtec) since 2008. (Facts ¶ 33).

[3] Wyeth did not address its dilution claim in the trial brief it submitted in the Opposition, and therefore appears to have effectively waived it.

### III.     AUTHORITY AND ARGUMENT

**A.     The Standards to be Applied to this Motion**

    **1.     Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering the evidence related to a summary judgment motion, the court must draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). There is no genuine issue for trial if the record, taken as a whole, could not lead a reasonable trier of fact (in this case, the Court) to find for the non-moving party. *Anderson*, 477 U.S. at 248.

In a non-jury case such as this, the Court may draw its inferences and make its decisions without a trial. *See Fleming v. U.S.P.S. AMF*, 1991 WL 278310, at *7 (N.D. Ill. Dec. 18, 1991) (Ex. 3); *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123-24 (5th Cir. 1978); *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 400-01 (1st Cir. 1988). "[W]hen nothing further will be gained by trial which will aid in the Court's determination of the matter, the Court should be free to decide the matter on summary judgment and save the litigants the time and expense of trial." *Emery v. Nat'l Life & Accident Ins. Co.,* 614 F. Supp. 167, 170 (S.D. Ill. 1985). Because the fact-finder here is the Court rather than a jury, and because there are no material facts in dispute, this case is particularly ripe for summary judgment.

    **2.     The District Court's Standard of Review for an Appeal of a TTAB Decision**

An appeal of a TTAB decision to a district court "is both an appeal and a new action, which allows the parties to request additional relief and to submit new evidence." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001). As such, "the district court sits in a dual capacity. It is an appellate reviewer of facts found by the TTAB and is also a fact-finder based on new evidence introduced to the court." *Id.* at 674.

The district court's review of a TTAB decision is *de novo* when the parties present new evidence and assert additional claims. *Id.* At the same time, however, the district court must

give deference to the TTAB's findings, and conduct a meaningful review of them. *Id.* at 674, 676. More specifically, it is the district court's task to determine whether the TTAB's findings were supported by "substantial evidence." *Id.* at 675-76. If not, such findings should be set aside. *Id.* (construing *Dickinson v. Zurko*, 527 U.S. 150 (1999)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 675 (citing *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). Therefore, the role of this Court is to (1) determine if the TTAB's findings were supported by "substantial evidence;" and (2) conduct a *de novo* review of the new evidence in this civil action.

**B.     The Operative Question of Likelihood of Confusion**

Likelihood of confusion is the central issue when reviewing a TTAB decision sustaining an Opposition. *CAE,* 267 F.3d at 674. The TTAB assesses likelihood of confusion by considering the thirteen factors identified in the *DuPont* test. *In re E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1361 (C.C.P.A. 1973). In this case, the TTAB majority analyzed seven of the thirteen *DuPont* factors, namely: (1) similarity of marks; (2) similarity of goods; (3) channels of trade; (4) consumer sophistication and care; (5) strength of the mark; (6) actual confusion evidence (or, in this case, the lack thereof); and (7) the applicant's intent. *Id.* These factors directly overlap with the seven likelihood of confusion factors established by the Seventh Circuit. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000).

In addition to these seven factors, both the TTAB and the Seventh Circuit consider the extent of potential confusion in a particular case, including whether confusion is likely among an appreciable number of consumers, *see DuPont,* 476 F.2d at 1361 (identifying as one of the thirteen relevant factors "the extent of potential confusion," i.e., whether it is substantial or *de minimis*); *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1219 (7th Cir. 1997); *Sparknet Commc'ns v. Bonneville Int'l Corp.*, 386 F. Supp. 2d 965, 978 (N.D. Ill. 2005) (even if plaintiffs could prove confusion was likely, they "did not demonstrate that such confusion would

affect a 'substantial' or 'significant' number of [relevant consumers]"), as well as whether there is a *probability* of confusion, not simply a *possibility* of confusion. *See Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.,* 954 F.2d 713, 719 (Fed. Cir. 1992); *accord Libman Co. v. Vining Indus., Inc.,* 69 F.3d 1360, 1363 (7th Cir. 1995) (noting a likelihood of confusion cannot be found based on pure conjecture or a far-fetched narrative alone); *Sparknet,* 386 F. Supp. 2d at 978 (noting that a slight possibility of confusion does not suffice).

In its analysis, the TTAB majority did not address whether confusion was likely to arise among a significant number of consumers, or whether confusion was probable rather than simply possible. These inquiries are highly relevant and must be considered by this Court.

Each likelihood of confusion factor may play a dominant role from case to case. *See Boston Red Sox Baseball Club L.P. v. Sherman,* 2008 WL 4149008, at *10 (T.T.A.B. Sept. 9, 2008) (Ex. 4) (holding the dissimilarity of the marks in and of itself was dispositive); *see also Barbecue Marx,* 235 F.3d at 1044 (varying weights can be assigned to factors in different cases). According to the Seventh Circuit, however, the three most important factors are intent, any evidence of actual confusion (or lack thereof), and similarity (or dissimilarity) of the marks. *Barbecue Marx,* 235 F.3d at 1044.

### 1.      The Opinions by the TTAB Majority and by the Dissenting Judge

The TTAB majority found that the factors concerning the similarities of the marks, the goods, and the channels of trade, and also the factor concerning the strength of the mark ALAVERT, weighed in Wyeth's favor. (Ex. 1, Maj. Op. pp. 12-18, 21-25). The TTAB majority found that the evidence of actual confusion factor and the consumer sophistication and care factor were "neutral." (Ex. 1, Maj. Op. pp. 18-21). The TTAB majority deemed Wyeth's claim of bad faith to be "negated" by the evidence. (Ex. 1, Maj. Op. pp. 25-26). The TTAB dissenting Judge concluded that confusion was not likely, primarily due to the lack of actual confusion evidence and the substantial dissimilarities between the parties' marks. (Ex. 2, Dis. Op. pp. 27-29).

5

2.      **Application of Likelihood of Confusion Factors and Discussion of New Evidence**

Walgreens does not dispute that the parties' goods are identical and sold through overlapping channels of trade. Solely for the purposes of this motion, and because the facts must be considered in a light most favorable to the non-moving party, Walgreens will not dispute the TTAB majority's finding relative to the strength of the mark ALAVERT. Even if these three factors are deemed to weigh in Wyeth's favor, however, no likelihood of confusion should be found in this case.

The TTAB majority's assessment and weighing of the factors of absence of actual confusion, [dis]similarities of the marks, intent, and sophistication/care of relevant consumers was not supported by "substantial evidence." *CAE,* 267 F.3d at 675-76; Administrative Procedure Act, 5 U.S.C. § 706(2)(E); *see also Barbecue Marx,* 235 F.3d at 1044. Additionally, new evidence relative to these factors has come to light in this civil action which weighs strongly in Walgreens' favor.

(a)      **No Evidence of Actual Confusion**

The single most important and telling factor in this case is the *total absence* of any actual confusion evidence. *See Barbecue Marx,* 235 F.3d at 1044 (characterizing this factor as one of the three most important).

(i)      *Evidence of Lack of Confusion Offered During the Opposition*

By the time the final Opposition trial brief was submitted in June 2007, Walgreens was selling WAL-VERT and ALAVERT products side-by-side at approximately 5500 Walgreens stores. (Facts ¶¶ 47, 67).

WAL-VERT had been promoted through in-store signage and featured in a Walgreens insert included in Sunday newspapers throughout the country. (Facts ¶¶ 48-50). Despite the parties'

marketing efforts and Walgreens' concurrent sales of both ALAVERT and WAL-VERT for
almost three years, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Oddly, the TTAB majority discounted the total absence of actual confusion, stating, "In
this case, it is unclear whether there has been a true opportunity for confusion." (Ex. 1, Maj. Op.
p. 20). The TTAB majority reasoned that Walgreens had sold WAL-VERT only under "highly
restricted conditions," including only in its own stores, in packaging that repeatedly referenced
Walgreens, and side-by-side with ALAVERT so the products could be immediately compared by
consumers.[4] The TTAB majority stated that "[w]e must evaluate the likelihood of confusion in
this case apart from these restrictive conditions. Consequently, the absence of actual confusion
with regard to sales under these conditions is of little probative value in assessing the likelihood
of confusion apart from these conditions." (Ex. 1, Maj. Op. p. 21).

There is no rule of evidence that prohibits the TTAB from considering the lack of actual
confusion when goods are sold side-by-side. (Ex. 2, Dis. Op. pp. 33-34). In many cases where
goods were sold side-by-side, courts and the TTAB found the absence of actual confusion
evidence highly probative, particularly where marks were concurrently used for many years.
*See, e.g., Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 490 (1st Cir.
1981) (where marks have been displayed side-by-side for a substantial period of time in same
market, yet no confusion evidence has come to light, a "strong presumption" arises that there is
little likelihood of confusion); *Top Tobacco, L.P. v. North Atlantic Operating Co.*, 2007 WL
118527, at *6 (N.D. Ill. Jan. 4, 2007) (Ex. 5), *aff'd*, 509 F.3d 380 (7th Cir. 2007) (where goods
coexisted on the same store shelves with no known confusion for over five years, court cited to
*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999)—
another case with coexistence five years—for the proposition that such evidence is very

---

[4] Evidence of actual confusion (or the lack thereof) will, of course, always come to light only in the
context of real-life conditions.

persuasive); *Toro Co. v. Grassmasters, Inc.*, 2003 WL 255724, at *6 (T.T.A.B. Feb. 4, 2003) (Ex. 6) (finding no actual confusion evidence probative where the parties' products were sold virtually side-by-side in some of the same stores for five years).

There was certainly considerable opportunity for confusion to have arisen. As the dissenting Judge pointed out, "[h]undreds of thousands of purchasers have entered applicant's stores and encountered both applicant's and opposer's products. These products are sold side-by-side. Despite these hundreds of thousands of opportunities for confusion to arise, there has been no reported instance of confusion." (Ex. 2, Dis. Op. pp. 31-32). The dissenting Judge further reasoned, "I would have thought that selling the products side-by-side, which means that they are sold in the same stores at the same time to the same consumers, would have been a true opportunity for confusion to occur." (Ex. 2, Dis. Op. p. 33); *see Libman*, 69 F.3d at 1361 (reasoning that "…if confusion were likely, one would expect at least one person out of this vast multitude to be confused, or more precisely one would expect [plaintiff] to have been able to find one such confused person.").

The products prominently bear the marks at issue (WAL-VERT and ALAVERT) and were sold side-by-side in approximately 5500 of the same stores to the same customers for almost three years with no instances of confusion. The TTAB majority's characterization of this factor as neutral rather than highly probative was not supported by "substantial evidence." *See e.g., Allen Bros., Inc . v. AB Foods LLC*, 2008 WL 345600, at *5 (N.D. Ill. Feb. 6, 2008) (Ex. 7) (finding that the absence of actual confusion evidence favored defendant); *Master Builders, Inc. v. Polymerica, Inc.*, 2004 WL 407353, at *22 (T.T.A.B. Feb. 24, 2004) (Ex. 8) (finding the lack of actual confusion evidence favored the respondent particularly because of the length of concurrent use and the relative success of the parties' products).

### (ii)     New Evidence of Lack of Actual Confusion

Since the final trial brief was filed in the Opposition in June 2007, two years have passed, Walgreens has opened well over a thousand new stores (Facts ¶ 27), and Walgreens has sold

8



of Walgreens' employees also proactively searched Walgreens' records for any evidence of confusion, but found none. (Facts ¶ 71).

ample and increased opportunities for confusion to have arisen. In particular, the new evidence

¶¶ 68, 71) strongly indicates that any such confusion would have been discovered had it occurred. *See Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,* 80 F. Supp. 2d 815, 883 (N.D. Ill. 1999) (finding lack of confusion evidence of heightened significance because the parties had been litigating for three years, thus giving the plaintiff "ample incentive to uncover evidence of actual confusion."). This new evidence further supports the conclusion that the absence of actual confusion evidence strongly favors Walgreens.

9



**(b)    Dissimilarity of the Parties' Marks**

The TTAB majority's finding relative to similarity of the parties' marks—another of the

three most important factors—was not supported by "substantial evidence." The TTAB majority

stated the following conclusion relative to this factor: "[B]ased on the full record, including the

fact that the goods of the parties are identical, we conclude that WAL-VERT and ALAVERT are

---

. "[I]t is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." *Nike, Inc. v. "Just Did It" Enters.,* 6 F.3d 1225, 1231 (7th Cir. 1993) (quoting *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1136 (2d Cir. 1979).

here. *See, CAE,* 267 F.3d at 677 ("Factual disputes are…material only when they might affect the outcome of the suit…") (quoting *Oest v. Ill. Dep't of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001)); *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 295, 298 (7th Cir. 1996).

10

similar in appearance, sound, and most notably in connotation and commercial impression." (Ex. 1, Maj. Op. p. 25). Notably, however, earlier in its analysis the TTAB majority stated "the marks do differ in appearance and sound." (Ex. 1, Maj. Op. p. 24). The TTAB majority did not reconcile these two statements, and did not articulate any similarities in the appearance or sound of the parties' marks, other than pointing to the fact that they both contain "VERT."

The TTAB majority found the commonality of the letters "VERT" in the parties' marks "of particular significance." (Ex. 1, Maj. Op. p. 24). Notably, Wyeth did not submit any evidence in the Opposition tending to show that consumers associate the suffix "VERT," in and of itself, with ALAVERT. In fact, Wyeth did not even argue that "VERT" was the more dominant or source-identifying portion of ALAVERT. Nonetheless, without any citation to the record, the TTAB majority reasoned that because "AL" is used in other marks for allergy medicines and related products, it is common and relatively weaker than the "VERT" component. (Ex. 1, Maj. Op. p. 24). Characterizing the "VERT" component as "strong," the TTAB majority found that potential purchasers were likely to recognize it and therefore believe that the owner of ALAVERT is associated with WAL-VERT. (Ex. 1, Maj. Op. p. 25).

First, even if a consumer recognized the "VERT" element in WAL-VERT, that does not necessarily lead to the conclusion that confusion is likely. To the contrary, as the dissenting Judge pointed out, "[t]he fact that one mark may bring another to mind does not in itself establish likelihood of confusion as to source." (Ex. 2, Dis. Op. pp. 27-28) (quoting *Jacobs v. Int'l Multifoods Corp.*, 668 F.2d 1234, 1236 (C.C.P.A. 1982)).

Second, the fact that parties' marks each contain "VERT" does not mean the marks *in their entireties* project the same commercial impression. As the dissenting Judge pointed out, marks must be considered as a whole and not dissected. (Ex. 2, Dis. Op. pp. 27-28). Even marks having an element in common that is totally arbitrary can be deemed dissimilar enough in overall commercial impression that no confusion is likely. *See, e.g., Barbecue Marx,* 235 F.3d at 1044 (finding no likelihood of confusion between SMOKE DADDY and BONE DADDY because the

11

marks were "visually distinct"). This is true even if the word or element shared by the marks is not in use by third parties. (Ex. 2, Dis. Op. pp. 27, 29 (citing *Lever Bros. Co. v. Producers Chem. Serv.*, 283 F.2d 879, 880 (C.C.P.A. 1960) (finding no likelihood of confusion between LUX and SHUX)); *see also Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355-56 (7th Cir. 1983) (finding no likelihood of confusion between MIRACLE WHIP and YOGOWHIP); *Olay Co. v. Avon Prods., Inc.*, 1973 WL 19958, 178 U.S.P.Q. 502, 504-05 (T.T.A.B. May 9, 1973) (Ex. 11) (finding no likelihood of confusion between OLAND and OLAY for closely related goods).

Third, there is no reason to believe consumers will focus on the "VERT" portion of "WAL-VERT" rather than the "WAL-" portion.[6] To the contrary, it is often held, and logically so, that the beginning of a mark is the most important or prominent in the eyes of consumers. *See, e.g., RE/MAX Int'l Inc. v. Singh*, 2008 WL 5256414, at *4 (T.T.A.B. Dec. 10, 2008) (Ex. 12) (and cases cited therein) (finding REMAX and SAVEMAX "obviously different" in appearance and pronunciation because of the different beginnings of the marks, and reasoning that if consumers put more emphasis on one part of the applicant's mark, it would be on SAVE because it is the first part of the mark); (Ex. 2, Dis. Op. p. 28) (citing *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005)); *see also Klein-Becker USA, LLC v. Prod. Quest Mfg., Inc.*, 429 F. Supp. 2d 1248, 1252-53 (D. Utah 2005) (finding no likelihood of confusion between STRIVECTIN-SD and NUVECTIN). Following the inherent logic of such cases, the differences between the first syllables of ALAVERT and WAL-VERT "would lead consumers to understand that the sources of the goods are different." (Ex. 2, Dis. Op. p. 28).

In addition to their different beginnings, the appearances of the parties' marks differ

---

[6] While the TTAB majority viewed "VERT" as more distinguishing than the "common" and "apparently weaker" element "AL" in ALAVERT, (Ex. 1, Maj. Op. p. 24), it did not explain why "VERT" would be viewed by consumers as more distinguishing or prominent than the "WAL-" prefix in WAL-VERT. Once again, Wyeth offered no evidence to support this finding and in fact did not even make an argument along these lines.

12

significantly in other respects. Most notably, ALAVERT is a single word mark, whereas WAL-VERT contains a hyphen. The hyphen makes WAL-VERT appear as a two-part mark, giving it a dissimilar overall impression. The TTAB majority did not appear to take this into account. There is no evidence that consumers would view "WAL-" as having two separate parts ("W" and "AL"), and that certainly does not seem likely given the overall appearance of WAL-VERT.

The parties' marks are also dissimilar in terms of sound. ALAVERT has three syllables, while WAL-VERT has two. "WAL-VERT" begins with a "W" sound which ALAVERT does not. The "WAL" at the beginning of WAL-VERT would be pronounced like "wall" by most consumers, whereas the "AL" at the beginning of ALAVERT would be pronounced like the man's name "Al." ALAVERT has an "A" in the middle of it which WAL-VERT does not have. None of these differences were addressed by the TTAB majority in its analysis.

In assessing the meaning of ALAVERT, the TTAB majority concluded that "ALAVERT combines 'pieces of the words ALLERGY and AVERT,'" (Ex. 1, Maj. Op. p. 16), and noted that the mark may also suggest the product will keep the user "alert." (Ex. 1, Maj. Op. p. 17). In

, "WAL" has no relevant meaning at all in English, either as a prefix or a word in its own right. The pairing of "WAL-" with "VERT" does not result in a mark that has any inherent meaning whatsoever in relation to allergy medicines. Indeed, the TTAB majority seemed to have effectively accepted Wyeth's argument that WAL-VERT is an "arbitrary" and "meaningless" term, having "no preexisting connotations" in the minds of consumers. (Ex. 1, Maj. Op. pp. 22-23). If ALAVERT is suggestive of an allergy averting product, or an allergy product that keeps the user alert, while WAL-VERT has no meaning whatsoever relative to allergy medicines, it seems logical to conclude that the marks do not have similar meanings.

New evidence in this civil action also bears on the comparison of the parties' marks.

13

More specifically, Walgreens retained Dr. Ronald Butters, an expert in linguistics, to assess the extent to which the linguistic features of the sound, sight and meaning of ALAVERT and WAL-VERT, especially when used as trademarks for similar products, might cause normal adult speakers of American English to linguistically confuse the two marks and the products to which they refer. (Ex. 13, Butters Report, p. 3). Dr. Butters' central conclusion was that ALAVERT and WAL-VERT are linguistically so distinct in terms of sound, appearance, meaning, and context that they offer little basis for linguistic confusion.[7] (Ex. 13, Butters Report, p. 10).

### (c)  Walgreens' Intent in Adopting "WAL-VERT"

"Intent," another one of the three most important factors, *Barbecue Marx,* 235 F.3d at 1044, refers to an intent to confuse consumers. *Allen Bros.,* 2008 WL 345600, at *6 (Ex. 7) (citing *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1120 (7th Cir. 1997)). Walgreens acted in good faith when it elected to use the suffix "VERT" together with its WAL- prefix in order to communicate to consumers that the active ingredient in WAL-VERT was equivalent to that in the national brand ALAVERT. (Facts ¶ 41). Walgreens had no reason to believe consumers would be any more confused by WAL-VERT than any of its other WAL-prefix marks. (Facts ¶ 41). No intent to confuse consumers can reasonably be inferred here.

Indeed, the TTAB majority found Wyeth's claim of bad faith negated by evidence that, in adopting the WAL-VERT mark, Walgreens relied on its past experience of having adopted and registered other WAL- prefix marks containing "recognizable elements" from the equivalent national brands without objection or any evidence of confusion. (Ex. 1, Maj. Op. pp. 25-26). The TTAB should have weighed this factor in Walgreens' favor. *See, e.g., Barbecue Marx,* 235 F.3d at 1046 (where there was no evidence of bad faith, the intent factor weighed in favor of the defendant); *Lincoln Fin. Advisors Corp. v. SagePoint Fin. Inc.,* 2009 WL 928993, *slip op.* at *12

---

[7] Wyeth, a large multi-national drug company with substantial resources, did not hire an expert to rebut Dr. Butters' conclusions. Even without the benefit of Dr. Butters' opinion, this Court can readily conclude that the TTAB's assessment of this factor was not supported by "substantial evidence" and should be set aside. Therefore, any dispute relative to Dr. Butters' conclusions should not preclude summary judgment here. *CAE,* 267 F.3d at 677; *McGinn,* 102 F.3d at 298.

(N.D. Ind. April 2, 2009) (Ex. 14) (same); *but see CAE,* 267 F.3d at 686 (holding that where

there was no intent to palm off, the intent factor was irrelevant to the likelihood of confusion

analysis).

        **(d)      Consumer Care and Sophistication**

            ***(i)     The Degree of Consumer Care in Purchasing Allergy
                     Medicine***

      "The degree of care factor seeks to distinguish how likely the relevant group of

consumers is to distinguish between different products." *S. Indus., Inc. v. JL Audio Inc.*, 29 F.

Supp. 2d 878, 892 (N.D. Ill. 1998). "[W]here consumers are sophisticated, deliberate buyers,

confusion is less likely." *Id.* (quoting *Rust*, 131 F.3d at 1217); *see also Magnaflux Corp. v.

*Sonoflux Corp.*, 231 F.2d 669, 671 (C.C.P.A. 1956) (consumers who exercise careful

consideration in purchasing are less likely to be confused).

      The TTAB majority acknowledged that OTC allergy medicines are not bought on

"impulse," and that a purchaser exercises "a certain degree of care in purchasing any medication,

even one which is relatively inexpensive." (Ex. 1, Maj. Op. p. 19). The TTAB majority also

found that "many purchasers may examine the information on the packaging to ensure that the

product is suitable for their needs." (Ex. 1, Maj. Op. p. 20). Notwithstanding these factual

findings, the TTAB majority characterized this factor as "neutral." (Ex. 1, Maj. Op. p. 20).



[REDACTED] *See, e.g., Blue Air, Inc. v. Soleus Mobility, Inc.*, 2004 WL 1459295, at *5 (N.D. Ill. June 25, 2004) (Ex. 15) (consumers who research air purifiers are less likely to be confused as to source or affiliation). While the products at issue here are not particularly expensive, (Facts ¶¶ 20, 39), products do not need to be expensive to be the subject of extra care. *Precision Foods, Inc. v. Major Prods. Co.*, 2001 WL 1131865, at *4 (T.T.A.B. Sept. 20, 2001), *aff'd*, 49 Fed. Appx. 308 (Fed. Cir. 2002) (Ex. 16) (finding that relevant consumers, including the ordinary public, would engage in a more informed and thoughtful decision-making process when purchasing relatively inexpensive non-prescription food thickener from drugstores because it is used to treat a medical condition). Given the foregoing evidence, the TTAB majority should have found that the degree of care factor favored Walgreens. *See, e.g., Smithkline Beckman Corp. v. Proctor & Gamble Co.*, 591 F. Supp. 1229, 1244 (N.D.N.Y. 1984), *aff'd*, 755 F.2d 914 (2d Cir. 1985) (finding that "a reasonably prudent purchaser would be somewhat more careful when purchasing over-the-counter medications than when purchasing other houseware or grocery items.").

New evidence in this civil action further supports weighing this factor in Walgreens' favor. [REDACTED]

[REDACTED]

[REDACTED] n,

"[REDACTED]

[REDACTED]

[REDACTED]

t[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

 *See, e.g., Precision Foods,* 2001 WL 1131865, at *4 (Ex. 16).

further demonstrates the degree of care makes confusion here far less likely.

    ***(ii)  Consumer Sophistication/Awareness of Private Label Goods***



  Additionally, consumers of OTC allergy products are likely to understand that many retail chains sell their own private label OTC allergy brands as lower-priced alternatives to national brand products. Many consumers expect to see private label alternatives to brand name products. (Facts ¶ 63). Store brands of OTC allergy medicines are significant competition for ALAVERT, (Facts ¶ 64), and most of the retailers to which Wyeth sells have their own private label brand. (Facts ¶ 64). In addition to Walgreens, retailers such as Wal-Mart, Target, CVS, and many grocery stores have their own store brands, (Facts ¶ 64), and offering private label, lower priced OTC allergy medicines is a common practice among large retail chains. (Facts ¶ 64). Indeed, the Federal Circuit has acknowledged that direct competition between national brands and private label store brands within the same stores "has become commonplace and

well-known in the marketplace." *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1565 (Fed. Cir. 1994). It is logical to infer that consumers are highly accustomed to retailers' sales of private label OTC goods, and are not likely to be confused when encountering same.

### 3. *De Minimis* **Potential for Confusion**

As indicated *supra*, this Court's *de novo* review of the new evidence should include an assessment of the extent of potential confusion (i.e., substantial or *de minimis*), *DuPont*, 476 F.2d at 1361, including an assessment of whether confusion is probable (not merely possible) among a substantial number of consumers. *Rust*, 131 F.3d at 1219; *Sparknet*, 386 F. Supp. 2d at 978; *Elec. Design*, 954 F.2d at 719. Whether this Court considers this factor regardless of extrinsic evidence surrounding the usage of WAL-VERT, or in light of marketplace realities,[8] it strongly favors Walgreens. Summary judgment is appropriate if there is no reasonable chance that any significant number of consumers could be confused. *CAE*, 267 F.3d at 677 (citing *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996)). That is the case here.

If this Court is inclined to exclude all extrinsic evidence surrounding usage of WAL-VERT (such as use of the house mark "Walgreens") from its analysis, it can still readily find that the potential for confusion in this case is *de minimis*, and that it is not probable that a substantial number of consumers will be confused. Such a finding can reasonably be made based on the total lack of actual confusion evidence despite the parties' investigative efforts and Walgreens'

---

[8] When the TTAB makes a likelihood of confusion determination, it does so based on the goods as they are identified in the application and pleaded registration, regardless of actual usage. *Rock-A-Bye Baby, Inc. v. DEX Prods., Inc.*, 867 F. Supp. 703, 711 (N.D. Ill. 1994); *H.D. Lee Co. v. Maidenform, Inc.*, 2008 WL 1976596, at *9 (T.T.A.B. May 6, 2008) (Ex. 17). When deciding issues of registrability and infringement in the context of an appeal of a TTAB decision, it is appropriate for a court to take into consideration extrinsic evidence surrounding the actual usage of the parties' marks and other real-life circumstances that bear on the question of likelihood of confusion in the marketplace. *See, e.g., CAE*, 267 F.3d 660 (affirming a district court decision involving both registrability and infringement that considered facts such as use of other words with the marks, the size and resources of the plaintiff and resulting ability to expand, the actual nature of the defendant's business, and other facts in making this type of determination). Logic dictates it would not make sense to use a different standard for deciding registrability in this *de novo* appeal due to the happenstance that there is no infringement action currently pending.

more than 5500 stores over almost five years; the substantial differences between the parties'
marks when considered in their entireties (as they must be); the lack of bad faith on the part of
Walgreens in adopting the mark WAL-VERT; and the degree of care and level of sophistication
of relevant consumers. Notwithstanding that this Court can readily find a likelihood of
confusion without consideration of extrinsic usage evidence, Walgreens submits this Court can
also take certain real-world conditions into consideration as part of its *de novo* review.[9] Indeed,
the CCPA has stated, "[w]e find no warrant, in the statute or elsewhere, for discarding *any*
evidence bearing on the question of likelihood of confusion." *DuPont*, 476 F.2d at 1362. "In
every case turning on likelihood of confusion, it is the duty of the examiner, the board and [the
CCPA] to find, upon consideration of *all* the evidence, whether or not confusion appears likely."
*Id.* Here, the parties' goods are in a perfect test situation for confusion, yet none has arisen.
Moreover, certain real life factors further support a finding of no likelihood of confusion. WAL-
VERT is only sold by Walgreens. (Facts ¶ 37). When consumers encounter WAL-VERT they
are surrounded by numerous other OTC medicines bearing different WAL- prefix marks, (Facts
¶ 47), and have been exposed to such marks for over 30 years. (Facts ¶ 32). WAL-VERT
consistently appears on the shelf next to ALAVERT so that the goods can be readily compared.
(Facts ¶ 37). The WAL-VERT packaging repeatedly references the house mark "Walgreens"
(including on the front side) (Facts ¶ 42), and features the language "Compare to ALAVERT®
active ingredient" on the front side. (Facts ¶ 44). This extrinsic evidence surrounding the use of
WAL-VERT further supports a finding that confusion is not likely. *See, e.g., Ziebart Int'l Corp.
v. After Market Assocs., Inc.*, 802 F.2d 220, 227 (7th Cir. 1986) (no likelihood of confusion
between knight helmet designs due to use of manufacturers' names by both parties); *Klein-
Becker*, 429 F. Supp. 2d at 1253 (any similarity between marks is disavowed by "compare to"

---

[9]Because this case involves a review of the TTAB's decision as to registrability, and there is no
counterclaim for infringement, this Court might not be inclined to consider extrinsic evidence surrounding
the usage of WAL-VERT in its analysis. Consideration of the real-world potential for confusion merely
confirms that the TTAB should be reversed, but is not outcome-determinative or necessary for the Court
to rule in Walgreens' favor. *CAE*, 267 F.3d at 677; *McGinn,* 102 F.3d at 298.

language on point of sale displays and packaging).

Wyeth's own conduct also strongly indicates Wyeth itself believes the potential for confusion here is *de minimis*, and not probable among an appreciable number of consumers.[10]

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛ These facts reveal that Wyeth must only be concerned about "the mere theoretical possibilities of confusion, deception or mistake," and not "the practicalities of the commercial world, with which the trademark laws deal." *No Fear, Inc. v. Day*, 1999 WL 769949, at *5 (T.T.A.B. Aug. 31, 1999) (Ex. 18) (quoting *Elec. Design*, 954 F.2d at 717). However, "[t]he Trademark Act does not speak in terms of remote possibilities of confusion, but rather, the likelihood of such confusion occurring in the marketplace." *Master Builders,* 2004 WL 407353, at *22 (Ex. 8).

## IV.    CONCLUSION

The TTAB majority's decision was not supported by "substantial evidence," and the new evidence obtained in the course of this civil action establishes with even more certainty that confusion is not likely to arise. Consideration of the undisputed facts decidedly indicates no reasonable fact-finder could find in Wyeth's favor. Therefore, reversal of the TTAB's decision is appropriate and summary judgment should be granted, allowing the application for WAL-VERT to proceed on toward registration.[11] *See, e.g., Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, at *15 (N.D. Ill. Oct. 6, 2006) (Ex. 19) (finding for the defendant where the three most important factors, plus degree of care, weighed in its favor).

---

[10] Similarly, Wyeth makes ROBITUSSIN and DIMETAPP, and sells those products to Walgreens. (Facts ¶ 14). Walgreens has offered private label equivalents under the marks WAL-TUSSIN and WAL-TAP since 1978 and 1993, respectively, and registered both these marks, with no objection from Wyeth. (Facts ¶ 14).
[11] Because Walgreens filed its application for WAL-VERT on an intent-to-use basis, if the application is allowed to proceed, the next step would be for the USPTO issue a Notice of Allowance, rather than a Registration Certificate.

Respectfully submitted,

LEYDIG, VOIT & MAYER, LTD.

Date:   June 24, 2009

 s/Mark J. Liss
Mark J. Liss (IL Bar No. 6181002)
Tamara A. Miller (IL Bar No. 6237169)
Caroline L. Stevens (IL Bar No. 6274252)
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601
Tel: (312) 616-5600
Fax: (312) 616-5700

Attorneys for Plaintiff Walgreen Co.

21